1961-4-1. We'll hear from Mr. Brewster. Thank you, your honors. My name is Clark Brewster and may it please the court, I represent Michael Castanon and the corporate plaintiff in this matter in connection with racing a horse at Remington Park. And just to give a little context, a complaint petition initially filed in the state court sets this out, but I just want to give a little bit of a backdrop. Mr. Castanon had a horse called EOS Political Win that was ready to run in the Remington Park Futurity, which is a million-dollar race that was set for April 22, 2017. And to get to that spot is a substantial property interest. I mean, he spent $100,000 on the yearling, prepped the horse to that race as a two-year-old in the spring, paid all of the sustaining payments, which were thousands of dollars, then engaged in a 24 separate races qualifying procedure where he was the fastest horse or had the fastest horse among all of the horses that ran that day, which was about 230 head of horses. He was the five to two favorite going into that million-dollar race on the 22nd of April. And what just abruptly took that property interest away from him was the fact that the stewards in this matter under the Oklahoma Horse Racing Commission had obtained through a previous horse that raced for his trainer, Mr. Gomez, EOS Trumster, no less, a horse that ran I think on and post-race testing was taken, both blood and urine. It was reported likely on the 9th or 10th of April to the stewards that there was a presumptive test of a therapeutic medication called clenbuterol in the urine. The stewards waited until the 21st day of April, the day before the race that Mr. Castanon was going to run the horse in and rendered a ruling against his trainer without notice, without hearing, without any evidence that he was summarily suspended as a result of the clenbuterol urine positive. And as a result of that, Mr. Castanon's horse, the next day was scratched. The idea that without any kind of notice to Mr. Castanon whatsoever, or Mr. Gomez, the trainer whatsoever, and a summary suspension without any semblance of an opportunity to explain, mitigate, or understand the circumstances divested Mr. Castanon of a substantial property right. As a matter of fact, just by virtue of the fact that he was the favorite going into that race on the 22nd was saleable. I mean, likely could have sold the horse for more than a million dollars just on the basis of that race and what his stallion value would be that day. And it's our position and it's set forth in our papers that the ruling by the stewards here without any notice, without any hearing, and after a number of days of knowing the positive was an attempt by them to disregard just basic conceptual procedural due process concepts and to divest Mr. Castanon of the right to run his horse, which was a substantial investment. And we've cited in our papers, but particularly it's the kind of claim that we believe, even though there's not a case on absolutely all fours, it's the circumstances that was discussed in the Colbruno case that when, that it's clearly established by virtue of the we have a situation that reasonable people under these circumstances could not believe that their conduct would not be unlawful. Particularly when you understand the nature of clenbuterol, which is a therapeutic drug widely used in the horse population and easily a contaminant for horses that aren't using it. And the fact that guideline that they attempted to dealt with a urine positive rather than a blood positive, like the directive required them. And then even more important, the entire action was ultra virus by virtue of the fact that this rule was never properly published or on the Oklahoma register. And so they just acted without any authority whatsoever. And on that basis, we, we pled this case and of course, Judge Russell has granted dismissal on the basis of qualified immunity and then remanded the state case on the state claims. And we urge the court to consider the fact that this is a property interest that was clearly protected. It was required at least without question, procedural due process. And we cited Barry versus Barchi, which I think is pretty abundantly clear on a pre hearing suspension. There has to be some elements in Barchi, for example, a Supreme Court decision, which was a harness race case. The stewards had given notice for 16 days, they offered an opportunity for the owner and trainer to come in and speak. And they didn't render a ruling until there was at least adequate time for there to be some consideration. The delay in this matter, which I believe was calculated and our evidence would show that and we pled as such, the day's delay really confronts the idea that there'd be any kind of an emergency. The medication that was found in the urine was not found in the blood, which I think the stewards absolutely knew they couldn't act upon other than in a perfunctory manner without notice. And not only that, but their own guidelines that predate the directive and probably were in effect because the directive wasn't a proper rule, provide for 140 picograms of urine. I mean, clenbuterol in urine as a threshold. There's just no question in my mind that this wasn't a calculated deliberate act in violation of procedural due process and truly an outrage to divest this man of his right to run the horse and his property interest, which was very valuable. I'd like to reserve my time in rebuttal or respond to any questions at this time. Judge Murphy, do you have questions? I have no question. Okay. Judge Morris, do you have questions? I don't have questions. Thank you. Okay. Mr. Brewster, I do have a few questions. Let me ask you on your theory with regard to a protected interest in using the horse for a business purpose and participating in a government-sponsored program. Why couldn't you have presented those arguments prior to your Rule 59E vote? Well, you know, we could have, I suppose, but I think they're clearly for the judge. I mean, after receiving his initial ruling, we tried to get some element of reconsideration. Even though he didn't find specifically that there wasn't a protected interest, it was perhaps entitled to due process, he found that there wasn't a clearly established law in place. I mean, so it's a good question. I think we supported the record sufficiently for him in the decision, and I think it's squarely before you at this point in time to determine whether there is a clearly established law. Well, even apart from the existence of a clearly established law, we've got a precedent. I know you're familiar with it. Servants of Pericles that the appellee refers to in the middle of their brief, I think on pages 15 and 16, that essentially says, as I recall it, that if an argument could have been presented prior to the filing of a Rule 59E motion, that that's not appropriate material for granting a Rule 59E motion. And since all that's being appealed is not the original decision, but the denial of the Rule 59E motion, I'm just wondering whether we're precluded under Servants of Pericles from considering those two theories. I know those are not your older theories, but those two in particular. Well, I believe you can make your decision one way or the other whether we were late in bringing that and should not be entitled to make that argument. I frankly think it was just further examples of what rights should be protected, analogous to the circumstances here. I'd go back to the Supreme Court decision, which I don't think the judge paid really any credence to the Barchi case where Justice Brennan in the concurrence, but with four of the other justices, said a final full hearing after Barchi had been barred from racing his horses and lost his clients to other trainers was an exercise in futility. And the point is, at least in Justice that they prevented him from running a horse had real value. And I think that applies here, particularly because it's a such a high purse case and a unique or very rare opportunity that was taken from him. Okay. Let me appreciate that. Let me switch gears a little bit. I want to make sure that I understand that you talked a little bit about the presence of the tested. But if I understood it before today, just make sure that I'm understanding it correctly. I was thinking that you were not quarreling with the disqualification of the trainer for the finding of the presence of flambuterol after the testing for the other horse. I think it's EOS in a political way. Is that correct or incorrect? Well, what's important is the context here. The rules of racing provide an absolute mandate to the stewards and the commission to give timely notice to the owner and the trainer. In one instance, the rule provides that if it takes more than 10 days by the lab, an additional time is needed. Here it was that they shall give notice to the owner for additional time. They knew of this test and then held it back. But if you would challenge a test at the time, it did not meet the directive, nor did it follow the rules with regard to medications, and the horse should not have been excluded. Which horse? I'm talking about the flambuterol positive that was found in urine. The directive states it must be found in blood. That is significant because there's a lot of contamination of flambuterol from stall legally receiving it. And you can have these trace contaminations, and that's exactly what happened. If they would have held a hearing, they would have found that the horse had never been given flambuterol for weeks on end, and it was a contamination that was traced in the urine. Believe me, this was a calculated disenfranchisement by public actors, and it truly is our goal to hold them accountable here. They disenfranchised this man of a significant property right without even any, I'm not talking about some notice, zero notice to the trainer or the owner. Yeah, and I understand that part of your argument. I just want to make sure that I'm understanding which horse you're talking about. So, for example, I know that you are arguing strenuously and well that for EOS Trumpster that you wanted a hearing because of the late notice you were not given a hearing. But for EOS of Political Win, when the trainer was disqualified, am I correct that you did not ask for a hearing in that case for the disqualification of a Political Win, and you're not complaining on appeal about the disqualification of the trainer for the presence of flambuterol for EOS of Political Win? No, not entirely. What happened was it was late on just a few minutes before 5 p.m. when they issued the edict without a hearing that said, you are scratched and ordered Gomez from the premises. Nobody to take care of the horses. I mean, he was ordered from the premises. Mr. Kastan lives in far western Oklahoma, was driving to the site at the time to attend the races the next day. Immediately, the previous week, incidentally, they had tried to suspend a trainer and his wife in the court. You probably saw this in the underlying ruling. The judge in that case says, well, that's unconstitutional. So rather than allowing Mr. Kastan to have a right to challenge the constitutionality of no notice or no hearing, they waited until 4.50. Now, this is on a Friday night. There's no judge available. So Mr. Kastan, when being anecdotally told by Mr. Gomez that he had been unilaterally suspended, immediately tried to talk to the stewards. There was no opportunity for a hearing. Reached out to the executive director and they wouldn't allow him to have someone else saddle the horse or anyone else take care of the horses, which is just absolutely extraordinary because there's a rule that allows you to transfer horses on the day of the races even. And it was just an effort to prevent any kind of consideration or any opportunity to get them to relent in some way for him to exercise his property right. Okay. Thank you very much, Mr. Brewster. Thank you. It will hear... Thank you. It will hear from the Affiliates Council, Mr. Yates. Thank you, Your Honor. This is Randall Yates on behalf of the Oklahoma Horse Racing Commission, its stewards and executive director. May it please the court. The ruling below can be affirmed for three reasons. First, Oklahoma law does not create a property interest in horse races that Oklahoma tracks. And second, that due process right is not clearly established. Third, there is no independent right to process itself at the district court, nor is that clearly established. This case is about horse racing officials doing their job by the book. Oklahoma law grants its horse racing officials plenary power for the forceful control of horse racing conducted within the state. Under its rule, the stewards are authorized to scratch a horse from a race for an invalid ground or reason or which, in their opinion, might affect the integrity or welfare of racing. The rules allow a steward to determine a horse ineligible and scratch it on race day and even up to the time of the race. And they're given this broad discretion intentionally to make quick decisions to guard against threats to the integrity of the sport and the health and safety of the racehorses. And both these interests are affected when the violation is the use of a banned substance on animals. What I did not hear in any of the argument before this was any interaction with the qualified immunity standard. On the first part of qualified immunity for due process, due process precedent makes clear that state law for specific objective criteria limiting official discretion to see if a property interest exists in the first place. And general statements of law cannot create property interest. Your Honor, I first want to be clear about what the interest is here because there was some confusion in the briefs. I think no doubt the complaint of conduct is the scratch. That's all that occurred here. The scratch of political win. Nothing about Trumpsters being challenged here. And a scratch, by definition, is the removal of one horse from one race. A scratch does no more than that. Thus, the interest here is just that spot in the race. Horse racing is not a government-entitled program. Stewards have absolute discretion in denying entry. Not everyone who is eligible for a spot in the race is guaranteed a spot in the race. You know, absolutely to the contrary, a steward can refuse entry to any race without notice under its broad discretion. And once it's entered, there's no objective and defined criteria for scratching horses from racism. And there are no rules or mutual understandings that plaintiff can or does point to that would determine an outcome at a hearing on a scratch determination. And appellants acknowledge at page seven of their brief that the stewards have the plenary authority over races under law. And plenary authority is the opposite of limited discretion. Thus, there's no property interest here. And on the first prong, that's not even where this inquiry ends, because this isn't a case where there was absolutely no opportunity to be heard beforehand. The appellants were afforded some sort of hearing with the administrative stay. So the next question is, how much process is due? Due process is not a fixed construct unrelated to time, place, and circumstances. So let's consider what the scope of the hearing would be. What would need to be determined for a scratch? And to that, we look to state law rules of racing. And under the rules, any horse that isn't eligible to start in any race may be scratched. And under another rule where it talks about ineligibility, it says, in addition to any other valid ground or reason, a horse is ineligible to start in a race if it is trained by any person who is suspended or ineligible for a license. The rules allow for these determinations to be on race day and up until the time of the race. So the determination to be made at that hearing under these time constraints is whether the trainer's license was suspended. If they figure that out, then they are allowed to scratch the horse in the race. And this could easily be made during the administrative stay proceeding, particularly when the license was just suspended the day before, because that is when they got the final report on the complete or all test, and that is when the trainer was primarily suspended. So, but if we, and moving on to the second prong of qualified immunity, I think that Appellant's case from the briefing on qualified immunity boils down to a single sentence on page 33 of their brief. They write, no reasonable horse race official in the wake of horse owner's interest without giving meaningful notice and adhering to effective parties. So these five cases show that a constitutional violation was clearly established at the time of the alleged violation. Only then is the horse racing official not entitled to qualified immunity. Clearly established law requires on point precedent. Clearly established law cannot be defined at a high level of generality. Some must apply with obvious clarity to the specific conduct at issue, particularized to the facts to put the question of whether a constitutional violation occurred beyond debate. And such that no reasonable official could conclude that their action was constitutional, that they knowingly violated the law or were plainly incompetent. And your honors, these five cases fail to put the question beyond debate. It's hard to see their relevance at all. None dealt with the specific conduct at issue. None dealt with the Oklahoma rules of racing. And the only case I heard discussed below before me was the Barry v. Barchi case. And that did deal with horse racing, but its relevance was also limited. The case didn't deal with a one-time scratch. And in Barchi was the actual occupational license that was issued. That's not at issue here. We don't dispute that Oklahoma law creates a property interest in the trainer's license, just in the spawn of the race. But Barchi also held, just going back to the suspension, that prima facie evidence of a drug violation would be enough to support a summary suspension. So while that's what triggered the scratch here, that's not what is at issue, your honors. So none of these cases would put these horse racing officials on notice that scratching horse from the race when the trainer's license wasn't suspended would violate the constitution. Oh, I think right now I could take questions, your honors. Okay. Judge Murphy, do you have questions for counsel? I have no questions. Okay. Judge Morris, do you have questions? No, I don't have any questions. Okay. Mr. Gates, let me ask you a question. Why wouldn't the delay in notifying the plaintiff of the lab results result in an arbitrary interference with their ability to exercise a state cause of action under MAK investment? In other words, Mr. Brewster's argument that he wasn't notified of the lab results until 10 minutes before the Oklahoma courts would close it. Well, we go back to what the underlying interest is, and the underlying interest was a spot on the race. That's what it wanted to secure. So before we get to that, whether the securing itself is a predictable interest, we have to decide if there's an underlying property interest, because process is not an end in itself. The constitutional purpose is to protect the substantive interest to which the individual has a legitimate claim of entitlement. That's the Olin case that it was. And MAK investment, which was a case that was decided after this, so it cannot be clearly established law at the time, it doesn't change it. It started with an underlying property interest. It was the real property subject to the flight determination. And the state created a process specifically to challenge that determination. And so that process became a part and parcel of that interest. And that's the same thing that happened in Logan, where the Illinois created a hearing interest for employment discrimination claims. So nothing like that is happening here. There is not a special hearing or procedure for scratch determinations. In MAK investments, Logan did not turn every judicial proceeding into a protectable interest. I think even to the extent that there would be a hearing that's a particular hearing that's close enough, that particular hearing would be, in this case, the administrative stay, which Pellant was not denied. And even to get to that point for the stewards to make a decision, there has to be a majority of the stewards that are on board for the administrative stay. It then goes to the executive director, who has to consult with at least three members of the commission before ruling. So we have at least six officials that need to be in on the decision. And in any case, that constitutional violation would also have to be clearly established here as well, which offers no cases and only offers cases that were issued afterwards. So in MAK investment, other than the availability of a cause of action, what was the distinct property interest? The underlying property interest was the property that was subject to the blight determination. In MAK investments, the court said that that was a real property interest that was affected and that this was the hearing to challenge it and that this blight determination hearing was part and parcel and that they had a right to notice, I think it was 30 days that they would not be given to challenge that blight determination. So if you're... So I guess under this principle... So if there's a horse race or a dog race and someone has complied with all of the... They've prepared for this. They've incurred huge capital expenditures and you're saying that if their place in the race is just arbitrarily taken away and if the state has unquestionably created a legitimate expectation and entitlement to a hearing, that it doesn't matter. You could arbitrarily just say, I don't like the way you look. Your horse is disqualified and that's not a due process violation because even though you had a legitimate entitlement to a hearing and it was arbitrarily taken away, that you had no property interest in participating in the race. Is that the There are other checks and balances within the system. I already mentioned that the stewards operate by majority vote, that whatever rulings they can be reviewed by the executive director who needs to consult with the commissioners and just within horse racing, it's in everyone's interest to have a full roster on race day. It's better for attendance. When you're doing scratches, you have to deal with refunds and there are other checks and balances. I think that the main thing that comes to mind where why a horse race scratch by a bad actor, for example, would be for some criminal conspiracy that would affect the outcome of the race for their own gain. The check and balance on that is criminal law. That's a felony that carries up to 10 years. There's also a discrimination claim. They can't discriminate for any unlawful purpose and that is not dependent upon the property interest. I think directly to your question on the process, they're asking specifically for the process, the administrative process, that's just the general process under the Administrative Procedures Act. Alternatively, in the district court, just the general hearing that you get before district court that has very broad jurisdictions and that those things in themselves are protectable rights independent of any underlying property interest. That's just incorrect. What they're asking for is just process in itself. Thank you very much, Mr. Yates. Kevin, I think, does Mr. Brewster have any time or is he used it? His time has expired. Your Honor, could I indulge? I think my opponent ran over a few minutes. Could I just have 30 seconds because I think there's some important points I'd trust you, but if I could have 30 seconds. Your opponent did not go over his time. Oh, my clock shows it, Matt. Maybe I did not go over. Okay, I apologize. The deficit, Mr. Brewster, I will give you 30 seconds. Okay. First of all, McGowan is a case, McCown v. Morales, where they allowed post-incident decision to establish law, so I think that MAC investments would apply here. I would also state that in this setting, keep in mind, this is quasi-criminal because it involves a fine and a suspension, and it's certainly quasi-judicial because it requires fact-finding to make the decision of a summary suspension. There's no minutes, there's no hearing, there's no communication with any licensee. This was a subterfuge. This was clearly in violation of the law, and this is what civil rights cases are for. All right. Thank you. Thank you very much, Mr. Brewster and Mr. Yates. It was well presented today and in your briefs. We appreciate the excellent ethics. This matter will be submitted.